UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ROBERT WOODRUFF,

      Plaintiff,

v.                                    Civil Action No. 2:13-24001

MICHAEL THORNSBURY, individually and
in his official capacity, and
TROOPER BRANDON MOORE, individually and
in his official capacity,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


Pending are separate motions for summary judgment by plaintiff Robert Woodruff against defendants Trooper Brandon Moore and Michael Thornsbury, and by Trooper Moore and Mr. Thornsbury against Mr. Woodruff, filed July 21, 2014.


I.


A.   General Allegations of the First Amended Complaint[1]

_____

[1] The court has used these allegations solely to provide context into the factual circumstances surrounding Mr. Woodruff's claims.  Assembling a factual recitation based upon the evidentiary record has proven difficult for at least three reasons.  First, the parties have provided very little in the way of citations to the discovery taken in the case.  Where those citations are offered, they constitute only bits and pieces of the far-ranging and complicated conspiracies alleged.  Second, the current posture of the case -- on cross motions for summary judgment -- causes difficulty in assembling a nonmovant-based

On September 30, 2013, plaintiff Robert Woodruff instituted this action.  He is a resident of Mingo County, West Virginia.  Defendant Michael Thornsbury was, at all relevant times, serving as a judge on the Circuit Court of Mingo County. Former defendant Jarrod Fletcher was, at all times relevant, the foreperson of the Mingo County grand jury.  Trooper Moore is a member of the West Virginia State Police.  Former defendant Jeff Cline is a close friend and confidant of Mr. Thornsbury.

Mr. Woodruff is married to Kimberly Woodruff.  He was formerly employed at Hampton Coal Company, a Mingo County coal mining facility.

According to the first amended complaint, from approximately January 2008 through spring 2009, Ms. Woodruff was Mr. Thornsbury's administrative assistant.  She endured his various forms of sexual harassment during this time, alleging she refused his proposed liaisons.

From approximately 2007 through early 2010, then-Judge Thornsbury cultivated a relationship with Trooper Moore with the design of securing influence over him in the performance of Trooper Moore's official duties.  Mr. Thornsbury is also alleged

factual presentation.  Third, multiple parties have invoked their Fifth Amendment privilege during discovery.

to have gained influence and control over Mr. Fletcher, who was Mingo County's Director of Homeland Security and Emergency Management when he was serving as foreman of the grand jury in 2009.  In 2008 and 2009, the two became business partners in multiple ventures.  That relationship was not widely known until mid-2009.

B.    The Alleged Conspiratorial Activities Aimed at Mr. Woodruff

1. The Cocaine Conspiracy

Mr. Thornsbury allegedly hatched a plan in the second half of 2008 to have Mr. Woodruff incarcerated.  According to the first amended complaint, Mr. Thornsbury instructed Mr. Fletcher to relay information to Trooper Moore and other, unnamed members of the West Virginia State Police that Mr. Woodruff had concealed cocaine under his pickup truck.  Mr. Fletcher was selected for this task based upon his influence as Director of Mingo County Homeland Security and Emergency Management.

At a later unspecified date, Mr. Thornsbury summoned Mr. Cline to his chambers.  Mr. Cline was instructed to attach a metal box filled with cocaine under Mr. Woodruff's vehicle.  Mr. Thornsbury explained that, with Mr. Woodruff out of the way, Ms. Woodruff would be forced to have a romantic relationship with him

3

out of financial necessity.  Mr. Cline agreed to plant the drugs
as directed but never followed through.

## 2.  The Scrap Metal Conspiracy

From 2006 through 2008, Mr. Woodruff salvaged scrap
mine-roof drill bits from his employer, Hampton Coal Company.  He
would then transport them to another facility for refurbishing.
Hampton Coal Company permitted him to do so.  In approximately the
second half of 2008, however, Mr. Thornsbury allegedly told
Trooper Moore that Mr. Woodruff was stealing the bits.  Mr.
Thornsbury instructed Trooper Moore to file charges to that effect
but to conceal Mr. Thornsbury's involvement.

Upon investigating the matter, Trooper Moore learned
that Mr. Woodruff was authorized to take the bits.  When Trooper
Moore informed Mr. Thornsbury, the latter nevertheless insisted
that Mr. Woodruff be charged with grand larceny.  On December 2,
2008, Trooper Moore filed a criminal complaint charging Mr.
Woodruff with three (3) felony counts arising out of his
authorized bit removal work.  He was charged with grand larceny,
receiving and transferring stolen goods, and obtaining money under
false pretense.  Following his arrest on the charges, Mr. Woodruff
was on bond from December 2, 2008, to January 9, 2009.  On that

end date, the charges were dismissed pending further investigation.

On January 14, 2009, Trooper Moore, again allegedly at Mr. Thornsbury's direction, filed an additional criminal charge against Mr. Woodruff for the same fraudulent scheme.  The charge remained pending from January 14, 2009, until August 21, 2013.  On that end date, it was dismissed with prejudice by the county prosecutor.

On January 20, 2009, Mr. Thornsbury appointed Mr. Fletcher as the foreperson of the Mingo County grand jury.  That grand jury was allegedly intended to indict Mr. Woodruff on certain charges related to the bit removal work.  The appointment ostensibly permitted Mr. Thornsbury to control the grand jury. That control allegedly resulted in the improper issuance of grand jury subpoenas duces tecum to oppress Mr. Woodruff and procure his indictment on felony charges.  Those subpoenas never appear to have been served upon him.  Trooper Moore was, however, allegedly called to testify before the grand jury against Mr. Woodruff on this matter in the absence of the prosecuting attorney.  The grand jury did not return an indictment.

### 3. The Assault and Battery Conspiracy

On or about January 25, 2012, Mr. Woodruff was involved in an altercation at a convenience store in Gilbert.  A police report indicated that two other individuals started the conflict, with one pulling a firearm.  Three eye witnesses reported as much.  Mr. Woodruff alleges that law enforcement reviewed a video recording of the altercation and confirmed the accounts.  A month later, however, Mr. Thornsbury allegedly told Officer Nathan Glanden, formerly a party to this action but dismissed at the Rule 12(b)(6) stage, to obtain an arrest warrant for Mr. Woodruff on charges of assault and battery.  Officer Glanden was not involved in the investigation up to that point.  On February 23, 2012, Officer Glanden executed the warrant.

Between February 2012 and October 2012, during which time Mr. Woodruff was on bond, Mr. Thornsbury instructed Mr. Cline to visit the Mingo County Prosecuting Attorney.  Mr. Cline was directed to tell the prosecutor to offer a plea agreement to Mr. Woodruff requiring a six-month term of incarceration on the assault and battery charge.  First time offenders on an offense of that sort are typically offered the penalties of a nominal fine and the payment of court costs.  The plea agreement offer was refused by Mr. Woodruff and his lawyer.  On October 31, 2012, just a few days before the scheduled trial, the case was dismissed.

Mr. Woodruff was only recently, prior to the filing of the complaint in this case, made aware of the conspiratorial activities directed against him.  The conspiracies were concealed until uncovered by federal law enforcement agents.

C.   The Claims Alleged

On September 30, 2013, Mr. Woodruff instituted this action.  The court recites only those counts which remain in controversy.  Count One is a claim pursuant to 42 U.S.C. § 1983 against Mr. Thornsbury and Trooper Moore for deprivation of his due process rights, malicious prosecution and false imprisonment arising out of the criminal proceedings relating to the bits and the assault and battery.  Mr. Fletcher is also named in Count One. The attempt to plant cocaine under Mr. Woodruff's truck is also mentioned.

Count Two asserts a conspiracy to pursue a malicious prosecution under state law arising out of the criminal proceedings relating to the bits and the plan to plant cocaine under Mr. Woodruff's truck.  The claim is pled pursuant to West Virginia Code section 55-7-9, which creates a civil claim for the violation of any West Virginia statute.  The predicate statutory violation is said to be the criminal conspiracy to falsely impute criminal liability to Mr. Woodruff.

7

Count Three alleges a claim for gross negligence arising out of the entire factual predicate pled and summarized earlier. Mr. Woodruff asserts that Mr. Thornsbury was obliged to adhere to the Code of Judicial Conduct and was negligent in attempting to produce a sexual liaison with Ms. Woodruff. He asserts that negligent act proximately caused the unlawful activities thereafter directed toward Mr. Woodruff.

Count Five alleges negligent infliction of emotional distress against all of the defendants without significant elaboration. Similarly, Count Six asserts a claim for intentional infliction of emotional distress arising out of the events that led to Mr. Woodruff's incarceration and prosecution. So, too, Count Seven pleads a false imprisonment claim resulting from Mr. Woodruff's incarceration on the trumped-up charges.[2]

---

[2] The proposed integrated pretrial order filed October 2, 2014, recasts the claims slightly. The claims there found are as follows: (1) a violation of section 1983 without elaboration on the constitutional right allegedly violated, (2) a conspiracy in violation of section 1983 also lacking elaboration, (3) a Fourth Amendment unreasonable seizure claim, (4) false imprisonment, (5) intentional infliction of emotional distress, and (5) negligent infliction of emotional distress.

If entered by the court, those modified claims will be the ones relied upon by Mr. Woodruff at trial. See Rockwell Intern. Corp. v. United States, 549 U.S. 457, 474 (2007) ("Here, we have . . . a final pretrial order that superseded all prior pleadings and 'controll[ed] the subsequent course of the action . . . .") (quoting Fed. R, Civ. Proc. 16(e)) (citing, in part, Curtis v. Loether, 415 U.S. 189, 190, n. 1 (1974) (where a claim was not included in the complaint, but was included in the pretrial order, noting it is irrelevant that the pleadings were never formally

D.   The Prosecution of Mr. Thornsbury


        On August 14, 2013, the United States filed an indictment charging Mr. Thornsbury with multiple civil rights conspiracies in violation of 18 U.S.C. § 241 arising out of the alleged circumstances discussed heretofore.  On September 19, 2013, Mr. Thornsbury was additionally charged by information with an entirely separate section 241 offense involving a different victim.  On September 30, 2013, Mr. Thornsbury signed a plea agreement in which he promised to plead guilty to the information in exchange for the dismissal of the indictment.  The court accepted the plea of guilty and, on June 14, 2014, Mr. Thornsbury was sentenced to fifty (50) months imprisonment.


                              II.


A.   Governing Standard


        A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

amended); <u>Syrie v. Knoll Int'l</u>, 748 F.2d 304, 308 (5th Cir. 1984) ("[I]ncorporation of a [new] claim into the pre-trial order ... amends the previous pleadings to state [the new] claim.")).

law." Fed. R. Civ. P. 56(c). Material facts are those establishing the elements of a claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh
the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th
Cir. 1995), nor make determinations of credibility.  <u>Sosebee v.</u>
<u>Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party
opposing the motion is entitled to have his or her version of the
facts accepted as true and, moreover, to have all internal
conflicts resolved in his or her favor.  <u>Charbonnages de France v.</u>
<u>Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are
"drawn from the underlying facts . . . must be viewed in the light
most favorable to the party opposing the motion." <u>United States</u>
<u>v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.  Mr. Woodruff's Motions for Summary Judgment

1. Against Trooper Moore

On February 21, 2014, Trooper Moore was deposed.  He
claimed his Fifth Amendment privilege for the questions posed to
him respecting his involvement with the claims alleged.

Mr. Woodruff asserts that the combination of an adverse
inference arising from invocation of the privilege, coupled with
other record evidence in the case including the timing of the
dismissal and refiling of the charges, and the charge of grand

11

larceny for property that was valued by him at less than the $1,000 required for grand larceny, entitles him to judgment as a matter of law against Trooper Moore.

The Fifth Amendment provides in material part that no person "shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. Amend. V; United States v. Under Seal, 737 F.3d 330, 333 (4th Cir. 2013).  The proscription "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant" -- it "also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (internal quotation marks omitted).

Claiming the privilege in a civil case, however, carries a consequence.  It permits the factfinder to draw an adverse inference against the party choosing to remain silent.  See Baxter v. Palmigiano, 425 U.S. 308, 319 (1976) ("[S]ilence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause."); ePlus Technology, Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) ("In a civil proceeding, a fact-finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self incrimination.").

A plaintiff's entitlement to the inference, however, does not necessarily warrant judgment as a matter of law. There is disagreement respecting whether the adverse inference should even be drawn at the Rule 56 stage. See ePlus Technology, Inc., 313 F.3d at 179 ("a fact finder is entitled to draw adverse inferences") (emphasis added). Some courts observe the inference at summary judgment is incompatible with a trial court's obligation to draw all reasonable inferences in favor of the nonmoving party. See, e.g., Stichting Ter Behartiging Van de Belangen Van Oudaandeel-houders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 55 (2d Cir. 2005) ("Even assuming that a jury might draw [adverse] inferences, however, we are required at summary judgment to draw all reasonable inferences in favor of the non-moving party . . . so we cannot conclude that [the invocation of the Fifth Amendment] resolves all genuine issues of fact[.]"); Parsons & Whittemore Enters. v. Schwartz, 387 F. Supp. 2d 368 (S.D.N.Y. 2005) (same).

Other authorities suggest that an adverse inference may be relevant to a summary judgment determination, even if it is not the sole basis upon which summary judgment is granted. E.g., SEC v. Colello, 139 F.3d 674, 677–78 (9th Cir. 1998) (holding that district court did not err in drawing an adverse inference against defendant based on his Fifth Amendment invocation in a summary judgment proceeding because there was "additional evidence" to

support the SEC's case); LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 391 (7th Cir. 1995) ("although inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds.") (quoted authority omitted); S.E.C. v. Monterosso, 746 F. Supp. 2d 1253, 1261-62 (S.D. Fla. 2010) ("[A] motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist.") (quoting United States v. Shuman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010)).

      The divide appears to have taken root in district courts within our own circuit.  Compare Custer Battles, LLC, 415 F. Supp. 628, 630 & n.1 (E.D. Va. 2006) (noting that the court declined to resolve a pending motion for adverse inference at the summary judgment stage, but returning to adjudicate the issue in the context of proposed jury instructions), with Maryland v. Universal Elections, Inc., 862 F. Supp. 2d 457, 464 (D. Md. 2012) (concluding that an adverse inference corroborated evidence concerning a party's state of mind, thereby eliminating any genuine dispute of material fact at the summary judgment stage), aff'd, 729 F.3d 370 (4th Cir. 2013).

The court need not resolve the appropriate treatment of the inference at the summary judgment stage.  The adverse inference desired by Mr. Woodruff, which he couples with other record evidence in the case relating to the timing of the dismissal and refiling of the charges, along with the charge of grand larceny for property that was valued by him at less than the $1,000 required for grand larceny, does not entitle him to judgment as a matter of law on the claims alleged against Trooper Moore.[3]  The disposition of those claims is thus left for the trier of fact.

---

[3]  Mr. Woodruff also allegedly testified during his deposition as follows:

> Q  Okay. Now, tell me about that. What happened? How did you find out you were being charged with a crime?
>
> A You talking about when the trooper come and picked me up--
>
> Q Yeah, yeah.
>
> A --at work?
>
> Q Yeah, tell me about it.
>
> A Trooper -- it was Trooper Boytek, I believe, come up on a job at Raw Coal where I was working, said he had a warrant for my arrest. I asked him, I said, "Was it" -- I said, "Is it about the bits, the scrap bits?" He's like "I can't comment on it," or something like that. And I said, "well, I had permission to get them." And he said, "Well," said, "I'm here to pick you up."

(Pl.'s Reply Mem. at 3).  The quoted deposition testimony, referenced for the first time in a reply brief, is not a part of the record in the case.  Also, there is no indication that Mr. Woodruff's exculpatory statement was passed on to Trooper Moore.

It is, accordingly, ORDERED that Mr. Woodruff's motion for summary judgment against Trooper Moore be, and hereby is, denied.

## 2. Against Mr. Thornsbury

During Mr. Thornsbury's sentencing hearing, the presiding judge referenced the circumstances that are at the center of this litigation.  Mr. Woodruff notes that the presiding judge observed as follows at the June 9, 2014, sentencing hearing:

> Unfortunately, as the relevant conduct in the Presentence Report indicates, that crime is not even the worst example in this case of your perversion of justice, transforming government in Mingo County into something unrecognizable as government.
>
> As the only circuit judge in Mingo County, you wielded tremendous power. And when you set your romantic sights on your secretary, you abused that power and the very justice system itself in an attempt to destroy her husband so that you could have her for yourself.
>
> You personally instigated and orchestrated an effort to plant illegal drugs on his vehicle. When that failed, you directed that he be charged with a crime which you and others involved knew was false. You rigged the entire system against this man, including the grand jury. That is nothing short of appalling and unacceptable in the United States of America.
>
> Yet, where was this citizen -- your secretary's falsely accused husband -- where was he to go for justice? The court system in Mingo County no longer existed for him. You made it a malevolent force bent on his destruction. Where could he go? To him, liberty ended. The Constitution became a dead letter for him.
>
> You corruptly contorted the justice system into a

weapon to be wielded against a romantic rival. That is
the kind of thing one might expect, though still
condemn, in the regime of some third world dictator. It
is an ugly insult to the United States Constitution.

In the sorry history of Southern West Virginia
political corruption, you're not the first judicial
officer or circuit judge to face this Court for
sentencing. Thus, it is important for this sentence to
send the message that this crime is utterly unacceptable
and intolerable, and that serious penalties await those
who corrupt our system of justice.

(Trans. of Sent. Hrg. at 33-34).  Mr. Woodruff asserts that these

observations from the bench are sufficient to collaterally estop

Mr. Thornsbury from challenging the constitutional claims alleged

against him, especially inasmuch as he did not object to the

presentence report or address the court at sentencing concerning

the circumstances surrounding Mr. Woodruff.

The requirements for collateral estoppel are well

established.  Syl. pt. 2, <u>Conley v. Spillers</u>, 171 W. Va. 584, 586,

301 S.E.2d 216, 217 (1983), provides that:

Collateral estoppel is designed to foreclose
relitigation of issues in a second suit which have
actually been litigated in the earlier suit even though
there may be a difference in the cause of action between
the parties of the first and second suit.

<u>Id.</u>; <u>see</u> <u>Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach</u>,

420 F.3d 322, 327 (4th Cir. 2005) ("Under 28 U.S.C. § 1738,

federal courts must give full faith and credit to state court

judgments. This includes the application of state preclusion rules

to determine whether a prior state court judgment has res judicata effect in a § 1983 action."). Issue preclusion is strong medicine, however, and subject to certain caveats. For example, the Supreme Court of Appeals of West Virginia has also observed as follows:

> But where the causes of action are not the same, the parties being identical or in privity, the bar extends to only those matters which were actually litigated in the former proceeding, as distinguished from those matters that might or could have been litigated therein, and arises by way of estoppel rather than by way of strict res ajudicata.

Lane v. Williams, 150 W. Va. 96, 100, 144 S.E.2d 234, 236 (1965); see also Abadir v. Dellinger, 227 W. Va. 388, 393, 709 S.E.2d 743, 748 (2011).

Overall, there are four criteria that must be established in order for collateral estoppel to apply:

> Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Syl. pt. 1, State v. Miller, 194 W. Va. 3, 6, 459 S.E.2d 114, 117 (1995); see also Abadir, 227 W. Va. at 933, 709 S.E.2d at 748.

While the parties do not reference it, there is also substantial scholarship directly on point. See, e.g., Jonathan Scott Baker, The Use of Sentencing Findings as a Collateral

Estoppel Weapon in Subsequent Civil Litigation, 85 Notre Dame L.
Rev. 713, 714 (2010); Wystan M. Ackerman, Note, Precluding
Defendants from Relitigating Sentencing Findings in Subsequent
Civil Suits, 101 Colum. L. Rev. 128 (2001).

          It seems apparent that the doctrine should not be
invoked in this action.  Foremost, the issues Mr. Woodruff now
seeks to foreclose were not finally adjudicated on their merits.
The sentencer stated his conclusions from the bench during a
criminal proceeding.  Mr. Thornsbury at that time was subject to
sentencing on an information that did not involve the issues in
this case.  A sentencing jurist's dispositional observations
listed in support of the judgment imposed should not constitute
the final word on largely unrelated civil claims.

          It is also questionable whether Mr. Thornsbury ought to
have been treated, in this later civil action, as having forfeited
a full and fair opportunity to litigate in his criminal case any
issues here involved.  He might have foregone his objections and
stood silent at sentencing solely in the hopes of assuring
acceptance of responsibility or securing a lighter sentence.  That
is not the same as a party in a civil case forfeiting defense of a
central issue in civil litigation where one's liberty is not at
stake.

Mr. Thornsbury was never adjudicated guilty of the circumstances here involved.  At Mr. Thornsbury's sentencing, there was apparently no mention of Mr. Woodruff until the sentencer was about to enter his oral Judgment.  Mr. Thornsbury thus had no occasion following the imposition of sentence to substantively address the judicial observations.  That is certainly not uncommon in federal criminal sentencing.  The presiding judge did precisely what one would expect at sentencing -- namely, enter a judgment after all parties have had an opportunity to be heard and the judge has remarked on a number of matters considered by him in reaching the sentenced imposed.  It is another matter entirely, however, to treat the observations made here as findings worthy of preclusive, and offensive, effect in a later civil action.

That conclusion is not inconsistent with the mine run of authority on point.  See, e.g., United States v. Certified Environmental Services, Inc., 753 F.3d 72, 100 (2nd Cir. 2014) (noting "[W]e have been wary of giving preclusive effect to factual findings made in a criminal sentencing even when the parties to the subsequent proceeding are the same, holding that 'precluding relitigation on the basis of [sentencing] findings should be presumed improper.'") (quoting United States v. Currency in the Amount of $119,984, 304 F.3d 165, 172 (2nd Cir. 2002) (quoting SEC v. Monarch Funding Corp., 192 F.3d 295, 306 (2nd Cir.

1999)); <u>Kosinski v. C.I.R.</u>, 541 F.3d 671, 677 (6th Cir. 2008) ("The procedural ground rules for criminal-sentencing proceedings differ considerably from the ground rules that govern civil actions. At sentencing, the defendant . . . 'has no absolute right either to present his own witnesses or to receive a full-blown evidentiary hearing,' . . [a]nd he does not enjoy the protection of the Federal Rules of Evidence, where the 'judge is largely unlimited either as to the kind of information he may consider, or the source from which it may come, so long as the information has sufficient indicia of reliability to support its probable accuracy.'"); Jonathan Scott Baker, supra, 85 Notre Dame L. Rev. at 727 (advocating a per se ban on extending preclusive effect to a federal district court's sentencing findings and noting that, "Three other circuits have essentially adopted the same rule as <u>Monarch Funding</u>: sentencing findings are presumed improper for collateral estoppel purposes, but their use is not per se banned.").

Mr. Woodruff makes clear in his reply brief that he moves under Rule 56 solely on issue preclusion grounds.  (Reply at 5 ("The only issue raised by Plaintiff with respect to his motion for summary judgment is the doctrine of 'collateral estoppel.'"). Under the circumstances, it is inappropriate to apply a preclusion doctrine here.  It is, accordingly, ORDERED that Mr. Woodruff's

motion for summary judgment against Mr. Thornsbury be, and hereby
is, denied.


C.   Mr. Thornsbury's Motion for Summary Judgment


          One can readily appreciate the substance of Mr.
Thornsbury's Rule 56 argument from the introduction found in his
memorandum in support:

> While the text of the amended complaint describes a
> shocking set of tabloid worthy claims, the allegations
> are nothing more than a near verbatim recitation of a
> now dismissed federal indictment against Mr. Thornsbury.
> Since the commencement of this civil suit, there has
> been no discovery of credible evidence to suggest that
> there was any conspiracy to wrongfully accuse Mr.
> Woodruff of any crimes. In fact, Mr. Woodruff himself
> concedes that his only knowledge of the allegations in
> the Complaint is the now dismissed federal indictment:

(Mem. in Supp. at 1-2 (emphasis added) (footnote omitted)).


          Mr. Woodruff points to evidence he has mustered
respecting each of the three alleged conspiracies.  Regarding the
cocaine conspiracy, defendant Jeff Cline testified during his
deposition that he reported to then-Judge Thornsbury's office one
evening.  When he arrived, he saw then-Judge Thornsbury and a man
named Bill Davis.  Mr. Davis had brought a black box in and set it
on the corner of then-Judge Thornsbury's desk.  Mr. Davis and
then-Judge Thornsbury had put some powdery residue into it.  Mr.
Davis and then-Judge Thornsbury secured the box, Mr. Cline was

instructed to take Mr. Davis to Mr. Woodruff's residence, and Mr. Davis would plant the box apparently on Mr. Woodruff's truck.

Mr. Cline then told Mr. Davis that Mr. Davis ought to return home and let Mr. Cline affix the box.  Mr. Davis agreed. Mr. Cline then left to affix the box but thought better of it.  He disposed of the item in the Tug River.  Then-Judge Thornsbury called Mr. Cline the next morning and asked where the box was, noting that Mr. Woodruff had not been arrested.  When asked during his deposition about the reason behind the plot, Mr. Cline stated that then-Judge Thornsbury told him "that he wanted Robert out of the way."  (Trans. of Jeffrey Cline at 21).

Regarding the scrap metal conspiracy, Mr. Thornsbury does not dispute that he appointed Mr. Fletcher as grand jury foreman on January 20, 2009.  He also admitted his unusual involvement in drafting the grand jury subpoenas duces tecum that were contemplated to be issued as a result of foreperson Fletcher's efforts.  During Mr. Thornsbury's deposition, the following exchange occurred:

> Q   All right. Paragraph 32 of the indictment, it alleges, "On or about January 22nd, 2009, Judge Thornsbury provided Foreperson Fletcher with several purported grand jury subpoenas that Judge Thornsbury had created and caused to be created." Are you denying --
>
> A   I gave him a form as to the format of the subpoenas. The subpoenas, when I went over there to dinner, had been predominantly prepared. There were many mistakes in those. And if you're calling that drafting, then maybe

it's drafting. But I actually I think I absolutely had
the authority to do it. I said that's not appropriate.
That comes out. That comes out. That comes out. That's
wrong. That's the wrong language and whether you do it
now or have to quash it later, it's wrong. So, yes, I
did that. So, however you want to -- however you want to
describe it.

(Trans. of Dep. of Michael Thornsbury at 51).

Regarding the assault and battery conspiracy, Mr. Cline
testified during his deposition that then-Judge Thornsbury told
him to carry a message to the county prosecutor that Mr. Woodruff
needed to be sentenced to six months in jail.  When Mr. Cline
delivered the message, the prosecutor told him he should speak
with an assistant, Matt Chandler.  When Mr. Cline carried the
message to Mr. Chandler, he conveyed then-Judge Thornsbury's
wishes but then added a message of caution, namely, that Mr.
Chandler should actually dismiss the charges inasmuch as "there's
more to this than you know. . . . Don't get your hands dirty."
(Trans. of Jeffrey Cline at 36).  Mr. Cline carried a similar
message to the presiding magistrate.

In addition to these items of evidence, it is
additionally the case that Trooper Moore invoked his Fifth
Amendment privilege in response to the following inquiries:

Whether then-Judge Thornsbury falsely reported to him
that Mr. Woodruff was stealing drill bits from Hampton
Coal Company and asked him to keep the source of the
report secret.

Whether then-Judge Thornsbury insisted that Trooper

24

Moore pursue a grand larceny charge against Mr. Woodruff arising out of the bits although by that time Trooper Moore learned that Hampton Coal Company authorized Mr. Woodruff to take the bits.

Whether he caused Mr. Woodruff to be arrested pursuant to an arrest warrant on the false charges.

Whether then-Judge Thornsbury directed him and Jarrod Fletcher to induce the Mingo County grand jury to issue subpoenas regarding the meritless investigation of Mr. Woodruff.

Whether then-Judge Thornsbury coerced him into arresting Mr. Woodruff.

Whether he knew Mr. Thornsbury was having an affair with Ms. Woodruff in or around 2008.

These excerpts from the evidentiary record and the reasonable inferences to be drawn therefrom, taken in the light most favorable to Mr. Woodruff, give rise to genuine issues of material fact regarding the federal and state claims.  It is, accordingly, ORDERED that Mr. Thornsbury's motion for summary judgment be, and hereby is, denied.[4]

D.   Trooper Moore's Motion for Summary Judgment

Trooper Moore moves for summary judgment on three grounds.  First, he asserts that Mr. Woodruff's claims are time

---

[4] Mr. Thornsbury also asserts that Mr. Woodruff is unable to prove damages.  The question of damages is reserved to the trier of fact.

barred.   Second, he contends that there is no evidence that he was
part of a conspiracy with Mr. Fletcher and Mr. Thornsbury.   Third,
he seeks qualified immunity for his actions.[5]

### 1. Limitations Defense

Regarding the limitations defense, Mr. Woodruff's claims
are subject to either a one- or two-year limitations period.   Mr.
Woodruff asserts that he was unaware of the conspiracy outlined in
the first amended complaint until 2013 and that the defendants
deliberately concealed its existence from him.   As noted at the
Rule 12(b)(6) stage of the case, the court construes these
assertions to give rise to an equitable tolling argument.

The same tolling rules apply to both the section 1983
and state tort claims.   See Wallace v. Kato, 549 U.S. 384, 394
(2007) ("We have generally referred to state law for tolling
rules, just as we have for the length of statutes of
limitations."); Wade v. Danek Medical, Inc., 182 F.3d 281, 289
(4th Cir. 1999) (stating "in any case in which a state statute of
limitations applies -- whether because it is 'borrowed' in a
federal question action or because it applies under Erie in a

---

[5] Trooper Moore additionally asserts that the mere invocation
of his Fifth Amendment privilege does not create a genuine issue
of material fact.   The court has addressed that issue supra in the
context of Mr. Woodruff's summary judgment briefing

diversity action -- the state's accompanying rule regarding equitable tolling should also apply.").

In syllabus point 5 of <u>Dunn v. Rockwell</u>, 225 W. Va. 43, 689 S.E.2d 255 (2009), the Supreme Court of Appeals of West Virginia set forth the rubric governing limitations defenses. The analysis at step four is summarized below:

> A five-step analysis should be applied to determine whether a cause of action is time-barred. . . . [Respecting the fourth step], if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. <u>Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled</u>. . . . Only the first step is purely a question of law; <u>the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact</u>.

<u>Id.</u> (emphasis added).

The question posed at step four relating to fraudulent concealment is not susceptible of resolution at the Rule 12(b)(6) stage under the circumstances presented. Trooper Moore is thus not entitled to summary judgment on limitations grounds.

### 2. Lack of Evidence of a Conspiracy and the Availability of Qualified Immunity

Our court of appeals recently observed, in accordance with its longstanding precedent, that a conspiracy claim under

section 1983 is established when a plaintiff "present[s] evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." Massey v. Ojaniit, 759 F.3d 343, 357-58 (4th Cir. 2014) (citing Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996)).

The analysis found in section II.C above notes a genuine issue of material fact respecting whether Mr. Thornsbury and Mr. Fletcher were part of a conspiracy to have Mr. Woodruff indicted for his innocent taking of the drill bits. Trooper Moore was directly involved with the investigation and prosecution of the criminal matters leading to that grand jury investigation.

On December 1, 2008, Trooper Moore is alleged to have caused an arrest warrant to issue for Mr. Woodruff on three (3) felony counts arising out of Mr. Woodruff's authorized bit removal work. Mr. Woodruff was charged at that time with grand larceny, receiving and transferring stolen goods, and obtaining money under false pretense. Mr. Woodruff was on bond from December 2, 2008, to January 9, 2009. On that end date the charges were dismissed.

On January 14, 2009, Trooper Moore filed an additional criminal charge against Mr. Woodruff for the same fraudulent scheme and appears to have had another arrest warrant issued for him. The charge remained pending for over four years from January

14, 2009, until August 21, 2013.  On that end date, the charge was dismissed with prejudice on the motion of the county prosecutor.

This timeline of events, coupled with Trooper Moore's multiple invocations of his Fifth Amendment privilege during questioning about the scrap metal conspiracy, are sufficient to raise genuine issues of material fact respecting the three section 1983 conspiracy elements recited in <u>Massey</u> and <u>Hinkle</u>.  For this same reason, Trooper Moore is not entitled to the defense of qualified immunity on that claim or any other.

It is, accordingly, ORDERED that Trooper Moore's motion for summary judgment be, and hereby is, denied.


III.


Based upon the foregoing discussion, it is ORDERED as follows:

1.   That Mr. Woodruff's motions for summary judgment be, and hereby are, denied;

2.   That Mr. Thornsbury's motion for summary judgment be, and hereby is, denied; and

3.   That Trooper Moore's motion for summary judgment be, and hereby is, denied.

The Clerk is directed to transmit copies of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER:  October 17, 2014

John T. Copenhaver, Jr.
United States District Judge